IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SHABBIR NOMANBHOY, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| vs. | ) Case No. 11 C 2456 |
| | ) Judge Joan H. Lefkow |
| ZEHRA VAHANVATY, AYMEN TYEBJEE, | ) |
| NAFEESA MOOSABHOY, and YUNUS | ) |
| NOMANBHOY, | ) |
| | ) |
| Respondents. | ) |

**OPINION AND ORDER**

Shabbir Nomanbhoy filed a petition to confirm an arbitration award under the United Nations Convention for the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention") and its enabling statute, 9 U.S.C. §§ 201–08. Before the court are Nomanbhoy's motion to confirm the award and respondents' motion to dismiss the petition for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). For the reasons set forth below, respondents' motion to dismiss the petition [#22] will be granted and Nomanbhoy's motion [#16] will be denied.

**LEGAL STANDARD**

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges the court's subject matter jurisdiction. The standard of review for a Rule 12(b)(1) motion to dismiss depends on the purpose of the motion. *See United Phosphorous, Ltd.* v. *Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2003) (*en banc*). If subject matter jurisdiction is not evident from the face of the complaint, the court analyzes the motion to dismiss under Rule 12(b)(1) as any other motion to dismiss and assumes for purposes of the motion that the allegations in the complaint are true. *Id.* Where, as here, "the complaint is formally sufficient but the contention

is that there is in fact no subject matter jurisdiction, the movant may use affidavits and other materials to support the motion." *Id.*; *Sapperstein* v. *Hager*, 188 F.3d 852, 855–56 (7th Cir. 1999); *Long* v. *Shorebank Dev. Corp.*, 182 F.3d 548, 554 (7th Cir. 1999). The court may weigh the evidence to determine whether jurisdiction has been established. *United Phosphorous*, 322 F.3d at 946. The burden of proof is on the party asserting jurisdiction. *Id.*

## BACKGROUND[1]

This dispute arises from Shabbir Nomanbhoy's management of and ownership in Dyna Care Health Ventures ("Dyna Care"), a company that provided home nursing services in Illinois, Michigan, Texas, Arizona, and Indiana. Dyna Care was founded in 1984 and its principal place of business was in Tinley Park, Illinois. Dyna Care did not provide any services outside the United States, had no operations outside the United States, and owned no property outside the United States.

Shabbir Nomanbhoy owned and operated Dyna Care with respondents, who are his family members. Respondents Aymen Tyebjee, Nafeesa Moosabhoy, and Yunus Nomanbhoy are his siblings. Zehra Vahanvaty is his niece. All of the parties to this dispute are U.S. citizens.

In 2004, Shabbir Nomanbhoy was a shareholder in Dyna Care as well as its CEO. A dispute arose regarding his management of the company and he was terminated from his management position. Subsequently, in 2005, Shabbir Nomanbhoy met with Tyebjee and one of their religious leaders, Shehzada Qaid Johar Bhaisaheb ("Shehzada Qaid"), in an attempt to work out an agreement.[2] The meeting took place in California and was not successful.

---

[1] In ruling on this motion, the court considers proffered materials relevant to the issue of jurisdiction, including the materials attached to the parties' memoranda of law.
[2] The parties are members of the Dawoodi Bohra sect of Shia Islam.

2

In 2006, Shehzada Qaid asked the parties to come to London to attempt to resolve their dispute.[3] While the parties were in London, Moosabhoy approached Shehzada Qaid's younger brother, Shehzada Mufaddal BS Saifuddin Saheb ("Shehzada Mufaddal") and asked for assistance in resolving the dispute. With Shehzada Mufaddal's help, the parties negotiated a settlement agreement in London over the course of several days.

On May 28, 2006, Shabbir Nomanbhoy, Yunus Nomanbhoy, Tyebjee, and Moosabhoy entered into a written settlement agreement (the "Settlement Agreement" or the "Agreement") "under the guidance and mediation of Shehzada Mufaddal." (Petition Ex. A at 1). The Settlement Agreement provided, *inter alia*, that Shabbir Nomanbhoy's ownership in Dyna Care would increase from 31.8% to 38.25% effective July 1, 2004, that Dyna Care would pay him $1 million by June 28, 2006, that Dyna Care's accountant, Kambiz Fallah, would perform a settlement of past accounts due (referred to in the Agreement as "*hisab*") by July 9, 2006, and that Yunus Nomanbhoy and Tyebjee would attempt to sell Dyna Care within two years for a minimum sale price of $18 million. The Settlement Agreement includes a non-exhaustive list of financial issues that were to be considered as part of the *hisab* and provides that Shehzada Mufaddal would "arbitrate in amount and time needed for payments" if the *hisab* cannot be resolved. The final paragraph of the Settlement Agreement provides: "If there is any disagreement about this 'Settlement Agreement' issues [sic] will be resolved by arbitration of Shehzada Mufaddal BS Saifuddin Saheb." (*Id.* at 3.)

The parties continued to have disagreements relating to Dyna Care, particularly concerning the *hisab*. On February 8, 2007, Shehzada Mufaddal circulated a document titled "Decisions taken by Shahzada Mufaddal Bhaysaheb Saiffudin Saheb on February 8, 2007 . . . in Colombo, Sri Lanka regarding Settlement Agreement done between Nomanbhoy family

---

[3] The details of the dispute are not included in the record.

3

members on 28th May 2006 in London." (S. Nomanbhoy Supp. Aff. Ex. B.) The document lists additional issues that must be settled as part of the *hisab* and directs the parties to settle and pay the *hisab* no later than March 30, 2007. It further provides that "*Hisab* meetings will be held in Cairo or London . . . for 9 days starting no later than March 17, 2007 and all parties must attend with all documents. . . . If agreement on any issue is not reached by the end of these meetings, I . . . will make decisions on these issues . . . by March 30, [20]07." (*Id.* at 1.)

In May 2007, the parties traveled to London and met with Shehzada Mufaddal, his assistants, and Dyna Care's accountant and attempted to come to an agreement as to the *hisab*. The accountant prepared a draft *hisab* that was circulated to the parties for comments. The process lasted for "several days" but failed to resolve the parties' dispute. (S. Nomanbhoy Supp. Aff. ¶ 17.)

In January 2008, the parties commenced arbitration before Shehzada Mufaddal in Colombo, Sri Lanka, where he was then residing. Shabbir Nomanbhoy, Tyebjee, and Moosabhoy were present at the five-day arbitration hearing. Yunus Nomanbhoy did not attend the arbitration.[4]

On February 3, 2008, Shehzada Mufaddal issued a written arbitration award (the "Award") that names Shabbir Nomanbhoy, Yunus Nomanbhoy, Vahanvaty, Tyebjee, and Moosabhoy as parties. (Petition Ex. B.) The introductory paragraphs of the Award state that the parties were unable to agree on the *hisab* as to Dyna Care and that, "in accordance with the terms of the Settlement Agreement, the Parties referred their disputes to [Shehzada Mufaddal] for settlement in any manner which [he] consider[s] just and equitable." (*Id.* at 1.) The introduction notes that the Settlement Agreement lacks a choice of law provision but concludes that the *hisab* can be resolved based on "just and equitable principles" and that "the question of applicable law

---

[4] Respondents assert that Yunus did not attend the arbitration because he did not receive adequate notice. (Aymen Tyebjee Aff. ¶ 14.)

4

does not arise in this case." (*Id.* at 2.) The introduction further provides that Shehzada Mufaddal, "with the consent of all the Parties . . . hereby make[s] the following binding and final Award in full and final settlement of all disputes between the Parties . . . and direct[s] all the parties to fulfill and honour the terms of this Award in good faith and finally settle all their disputes in accordance with the Award." (*Id.*)

The Award directs the parties to distribute all cash funds held by Dyna Care to its shareholders by February 15, 2008 (minus $700,000 for the payment of rent, taxes and incidental expenses), sets forth deadlines and procedures whereby the *hisab* will be completed up until the end of 2007 in accordance with the terms of the Settlement Agreement, and reiterates that Shabbir Nomanbhoy shall receive a settlement for the full amount of his 38.25% ownership in Dyna Care. The Award further provides that Tyebjee will receive a two-year severance payment, that Shabbir Nomanbhoy will be reimbursed for his travel expenses if the other parties have also received travel reimbursements, and that a $10,000 penalty will be imposed on any party who fails to meet the deadlines set forth in the Award. Shehzada Mufaddal would determine the amount of any penalty.

On April 13, 2008, Shehzada Mufaddal's agent, Dr. Luvai Dawood, emailed the parties with an amendment to the Award that added the word "not" to the following paragraph: "Severance/non-compete pay will be paid to Sk. Abdaobiturab and Aymen Tyebjee for two (2) years of salary for a maximum of US$4000,00 each, and this will [not] include any salary paid/accrued after sale date of company assets to Amedysis." (Petition Ex. C.)

Nomanbhoy filed his petition to confirm the Award on April 12, 2011.

## ANALYSIS

Respondents argue that this court lacks subject matter jurisdiction over Nomanbhoy's petition because the Award does not fall under the New York Convention and that, even if the

5

court does have jurisdiction, the petition must be dismissed as untimely.[5] Because the court concludes that it lacks subject matter jurisdiction over the petition, respondents' motion to dismiss under Rule 12(b)(1) will be granted.[6]

Article I(1) of the New York Convention provides: "This Convention shall apply to the recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought . . . . It shall also apply to arbitral awards not considered as domestic awards in the State where their recognition and

---

[5] Under the Convention, a petition to confirm an award must be filed within three years of the date the award was "made." 9 U.S.C. § 207. Nomanbhoy's petition was filed more than three years after February 3, 2008, the date of Shehzada Mufaddal's award. Nevertheless, he argues that the petition is timely because the statute of limitations did not start to run until April 13, 2008, when Shehzada Mufaddal corrected the award. Although the court is not required to decide this issue in light of its jurisdictional ruling, it is skeptical of the merits of Nomanbhoy's argument. Under Sri Lanka's Arbitration Act, which applies to all arbitrations "commenced" in Sri Lanka, an arbitrator has only two weeks to correct clerical errors in a final award unless the parties agree otherwise. *See* Sri Lanka Arbitration Act (No. 11 of 1995) arts. 2(1), 17, 27(3), *available at* http://www.commonlii.org/lk/legis/num_act/aa11o1995183/ (last visited Dec. 14, 2010); *see also* Gary Born, *International Arbitration* 536 (2011) (explaining that the law of the arbitral seat usually governs the form the arbitration award must take). The Act further provides that a party to an arbitration agreement may apply for enforcement of an award in the Sri Lankan High Court "within one year after the expiry of fourteen days of the making of the award." *Id.* art. 31(1). This language regarding enforcement indicates that an award is deemed "made" on the date it is issued, not on the date when an arbitrator issues a correction to the award. *See also id.* art. 25(3) ("The award shall state its date and place of arbitration . . . . The award shall be deemed to have been made at that place."). Therefore, even if the court did have jurisdiction over Nomanbhoy's petition, under the applicable procedural law it appears that the award was "made" on February 3, 2008 and his petition to confirm the award under the New York Convention was not timely filed. Moreover, Shehzada Mufaddal's correction was issued more than two weeks after the issuance of the award. Finally, to the extent that Shehzada Mufaddal intended to issue a partial award so that he could retain jurisdiction to impose penalties on non-compliant parties, it is unclear whether he had the authority to do so. *See* Sri Lanka Arbitration Act art. 26 (award shall be "final and binding"); Alan Redfern and Martin Hunter, *Law and Practice of International Arbitration* 372 (4th ed. 2004) ("[I]f there is no express or implied provision for an arbitral tribunal to make a partial or interim award . . . it is doubtful that the tribunal has the power to do so.").

[6] Nomanbhoy does not allege subject matter jurisdiction based on diversity of citizenship under 28 U.S.C. § 1332(a). It appears from the complaint that the parties are not completely diverse. Nomanbhoy is a citizen of California and Vahanvaty is a resident of California with a business address in California. (Compl. ¶¶ 2, 11). This suggests that Vahanvaty, like Nomanbhoy, is a citizen of California. *See* 13E Charles Alan Wright, et al., *Federal Practice & Procedure* § 3612.

enforcement are sought." The parties do not dispute that the Award was "made in" Sri Lanka. Therefore the Award clearly falls within the scope of the first sentence of Article I(1).[7]

Recognition and enforcement of an arbitration award must be pursued according to the Convention's implementing legislation, however. *See* 9 U.S.C. § 201. Pursuant to 9 U.S.C. §§ 203 and 207, district courts have jurisdiction over petitions to confirm arbitration awards that "fall[] under" the Convention. 9 U.S.C. § 202, titled "Agreement or award falling under the Convention," provides in relevant part:

> An arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title [9 U.S.C. § 2], falls under the Convention. An agreement or award arising out of such a relationship which is entirely between citizens of the United States shall be deemed not to fall under the Convention unless that relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states.

The parties agree that the Award arises out of a commercial relationship and satisfies the requirement of the first sentence of section 202. They dispute whether the Award has a reasonable relation with a foreign state, a requirement imposed by the second sentence of section 202 because the Award is wholly between U.S. citizens.

When Congress passed implementing legislation for the Convention, it added the foreign element requirement in section 202 to prevent the displacement of domestic arbitration laws in disputes that were not truly international. *See Certain Underwriters at Lloyd's London* v. *Argonaut Ins. Co.*, 500 F.3d 571, 576–77 (7th Cir. 2007). Richard D. Kearney, the Chairman of the Secretary of State's Advisory Committee on Private International Law, testified before the

---

[7] The United States, when it acceded to the Convention, made a reservation that it would only recognize awards made in the territory of another contracting state. Sri Lanka is a signatory to the Convention. *See* United Nations Commission on International Trade Law, *Status 1958 Convention on the Recognition and Enforcement of Foreign Arbitral Awards*, http://www.uncitral.org/uncitral/en/uncitral_texts/arbitration/NYConvention_status.html (last visited Dec. 14, 2010).

7

Senate Committee on Foreign Relations: "We have included in section 202 a requirement that any case concerning an agreement or award solely between U.S. citizens is excluded unless there is some important foreign element involved, such as property located abroad, the performance of a contract in a foreign country, or a similar reasonable relation with one or more foreign states." Foreign Arbitral Awards, S. Rep. No. 91-702, 91st Cong., 2d Sess. 6 (1970) (Appendix; Statement of Richard D. Kearney). Kearney explained that the "reasonable relationship" criterion had been taken from the general provisions of the Uniform Commercial Code section 1-105(1), which "permits the parties to a transaction that bears a reasonable relationship to any other state or nation to specify that the law of that state or nation will govern their rights and duties." *Id.*[8] Kearney stated that the purpose of section 202 was to "modify the definition of commerce" to "make it quite clear that arbitration arising out of relationships in interstate commerce remains under [section 1] of the original [Federal] Arbitration Act and is excluded from the operation of the proposed chapter 2 [implementing the New York Convention]." *Id.*

In *Lander Company, Inc.* v. *MMP Investments, Inc.*, 107 F.3d 476 (7th Cir. 1997), the Seventh Circuit held that an award made in New York in an arbitration between two United States companies had a "reasonable relation" with a foreign state because the contract that gave rise to the dispute concerned the distribution of shampoo in Poland. 107 F.3d at 482. The court of appeals explained, "Chapter 2 of title 9 authorizes the enforcement of arbitration awards in disputes wholly between U.S. citizens if . . . the dispute arose out of a contract involving performance in a foreign country" or has "some other reasonable relation with a foreign country

---

[8] The official comment to U.C.C. § 1-105(1) provides: "Ordinarily the law chosen must be that of a jurisdiction where a significant enough portion of the making or performance of the contract is to occur or occurs." The comment states that the "reasonable relation" test is similar to the test used in *Seeman* v. *Philadelphia Warehouse Co.*, 274 U.S. 403, 408, 47 S. Ct. 626, 71 L. Ed. 1123 (1927), where the Supreme Court explained that when a contract is made in one place but performed in another, it will be governed by the law of the place that has a "natural and vital connection with the transaction."

8

. . . . [T]he relationship between Lander and MPP falls squarely within the inclusion." *Id.* The Seventh Circuit has not considered section 202 in the context of an agreement or award, like those at issue here, which are between U.S. citizens but were made abroad.[9]

Other courts have held that the selection of a foreign arbitration forum and foreign governing law, taken alone, does not create a reasonable relation with a foreign state. *See ENSCO Offshore Co.* v. *Titan Marine LLC*, 370 F. Supp. 2d 594, 600–01 (S.D. Tex. 2005) (salvage agreement specifying arbitration in London under English law did not have a reasonable relation with a foreign state because agreement was between United States citizens regarding salvage that occurred "just off the Gulf Coast" and envisioned that salvaged rig would be delivered in Texas); *Jones* v. *Sea Tow Servs. Freeport NY Inc.*, 30 F.3d 360, 365–66 (2d Cir. 1994) (Lloyd's Standard Form of Salvage Agreement did not create reasonable relation with England where agreement was between U.S. citizens and involved salvage of New York-based

---

[9] Although not cited by the parties, some authority suggests that the New York Convention applies whenever an arbitration award was made in a foreign state, irrespective of the citizenship of the parties to the award. *See Republic of Argentina* v. *BG Group PLC*, 715 F. Supp. 2d 108, 119 (D.D.C. 2010) ("[I]n reading Section 202 *in pari materia* with the New York Convention, it is evident that Congress did not intend for this provision to relate to arbitral awards issued outside of the territorial jurisdiction of the United States, as an award rendered under that circumstance falls within the explicit language of the 'extraterritorial' provision of Article I(1) of the Convention."); *Restatement (Third) of Foreign Relations Law* § 487 cmt. (b) ("[T]he critical element is the place of the award: if that place is in the territory of a party to the Convention, all other Convention states are required to recognize and enforce the award, regardless of the citizenship or domicile of the parties to the arbitration."); *see also Jacada (Europe), Ltd.* v. *Int'l Mktg. Strategies, Inc.*, 401 F.3d 701, 707 (6th Cir. 2005) ("Given that it is a simple factual inquiry to determine the country in which an arbitration award was made, we can divine no purpose for the second sentence of § 202 other than determining whether an award will be 'not considered as domestic' under American law."), *abrogated on other grounds by Hall Street Assocs., LLC* v. *Mattel, Inc.*, 552 U.S. 576, 128 S. Ct. 1396, 170 L. Ed. 2d 254 (2008); *Bergesen* v. *Joseph Muller Corp.*, 710 F.2d 928, 933 (2d Cir. 1983) ("Inasmuch as it was apparently left to each state to define which awards were to be considered nondomestic . . . Congress spelled out its definition of that concept in section 202."). By failing to cite or rely on these authorities, Nomanbhoy has forfeited the argument that section 202 is inapplicable.
    The plain language of section 202, moreover, establishes the framework for analyzing any "agreement or award" that ostensibly falls under the Convention, including awards made outside the United States. *See also International Arbitration* at 149–50, 1020; 4 Ian R. Macneil, Richard E. Speidel, Thomas J. Stipanowich, *Federal Arbitration Law* § 44.9.4 (1995). The legislative history supports this conclusion. *See* Senate Rep. No. 91-702, 91st Cong., 2d Sess. 6. In the absence of binding authority to the contrary, the court applies section 202 in accordance with its plain meaning and legislative history.

pleasure craft on Atlantic Beach, Long Island); *Reinholtz* v. *Retriever Marine Towing & Salvage*, No. 92-14141, 1993 WL 414719, at *5 (S.D. Fla. May 21, 1993) (award made in London under English law pursuant to Lloyd's Standard Form of Salvage Agreement did not fall under Convention because award was between U.S. citizens and concerned the salvage of vessel off the Florida coast); *Brier* v. *Northstar Marine, Inc.*, No. 91-597, 1992 WL 350292, at *7–8 (D.N.J. Apr. 28, 1992) (Lloyd's Standard Form of Salvage Agreement did not have reasonable relation with England because agreement was between U.S. citizens and concerned salvage of pleasure craft that ran aground in New Jersey harbor).[10] The leading case is *Jones*, one of several to consider the arbitration provision in a standard form salvage agreement that covered salvage operations performed in or just outside of U.S. waters. There, the Second Circuit held that "[t]he reasonable relation requirement necessary to make the arbitration provision in the [agreement] cognizable under the Convention cannot be fulfilled by the terms of the [agreement] itself." 30 F.3d at 366.

Courts have also analyzed section 202 in the context of employment contracts, *Freudensprung* v. *Offshore Tech. Servs., Inc.*, 379 F.3d 327, 341 (5th Cir. 2004) (employment contract for performance of pipe-fitting on barges in West Africa was enforceable under the Convention); *Matabang* v. *Carnival Corp.*, 630 F. Supp. 2d 1361, 1365 (S.D. Fla. 2009) (employment contract for cruise-ship performer did not fall under Convention where only foreign element was the fact that cruise ship spent time in Bahamian waters); *Wilson* v. *Lignotock U.S.A.*, 709 F. Supp. 797, 799 (E.D. Mich. 1989) (employment contract that required

---

[10] Most of these cases address motions to compel arbitration pursuant to an arbitration agreement rather than motions to confirm arbitration awards. Because section 202 applies on its face to "agreements or awards," they provide persuasive authority. *See Jacada*, 401 F.3d at 707 (noting that cases that "craft a general standard out of § 202" are relevant to actions to compel arbitration as well as petitions to confirm an award); Senate Rep. No. 91-702, 91st Cong., 2d Sess. 7 ("[T]he provisions of section 202 or the implementing legislation are applied specifically both to enforcement of arbitration agreements and of arbitral awards.").

Detroit-based manufacturer's representative to make incidental business trips to Europe did not have a reasonable relationship to Switzerland), franchise agreements, *Access Info. Mgmt. of Haw., LLC* v. *Shred-It Am.*, No. 10-00622, 2010 WL 4642045, at *4–6 (D. Haw. Nov. 2, 2010) (franchise agreement for distribution of products in Hawaii did not fall under Convention even though it was executed in Canada and one party chose to maintain corporate office in Canada), and stock purchase agreements, *Amato* v. *KPMG LLP*, 433 F. Supp. 2d 460, 478 (M.D. Pa. 2006) (agreement for the purchase of European securities on European exchanges fell under Convention), *order vacated in part on reconsideration by* 2006 WL 2376245 (M.D. Pa. Aug. 14, 2006). In general, arbitration agreements or awards fall under the Convention where they result from a contract or relationship involving performance of a service abroad. *See Lander*, 107 F.3d at 482; *Freudensprung*, 379 F.3d at 341. But they do not fall under the Convention if foreign travel is only incidental to the parties' obligations. *See Access Info.*, 2010 WL 4642045, at *4; *Matabang*, 630 F. Supp. 2d at 1365; *Wilson*, 709 F. Supp. at 799.

Turning to the facts of this case, Dyna Care is located in the United States and has no property or operations in a foreign state. All of the parties to this dispute live and work in the United States. Dyna Care's accountant, Fallah, maintains an accounting practice in Willowbrook, Illinois. (S. Nomanbhoy Second Supp. Aff. ¶ 5.) The Settlement Agreement and Award do not mention foreign law, performance in a foreign country, or enforcement in a foreign country. All of the instructions in both documents concern the distribution of U.S. property among U.S. citizens. In addition, the Award discusses the calculation of federal income tax, state tax, Medicare, "Texas valuation," capital gains tax, and "severance/non-compete pay," and all of the amounts quoted are in U.S. dollars. (Petition Ex. B ¶¶ 7–12.) These facts suggest that the Award does not arise from a relationship that has a significant foreign element.

Nomanbhoy argues that the parties' negotiation and execution of the Settlement Agreement created new rights and obligations that had a reasonable relation with England. The plain language of section 202, however, directs courts to focus on the "legal relationship" that the arbitration agreement or award "aris[es] out of." *See Access Info.*, 2010 WL 4642045, at *4 ("The focus of whether a commercial relationship has a reasonable relation to a foreign state is not on the Franchise Agreement alone, but rather the 'legal relationship in which the arbitration or arbitral award arises.'" (quoting *ENSCO*, 370 F. Supp. 2d at 601)). Therefore the relationship at issue is the parties' ownership and operation of Dyna Care, which is completely domestic.

Of equal significance, the record indicates that the parties chose to negotiate a settlement agreement in London due to Shehzada Mufaddal's travel schedule and not because their dispute had a connection to England or because they sought a neutral foreign arbitral seat.[11] *Cf. International Arbitration* at 150 (suggesting that section 202 should be interpreted to allow sophisticated parties to select a neutral arbitral seat, particularly where the seat has expertise or historical experience with the type of dispute at issue). Indeed, the Settlement Agreement does not state that arbitration before Shehzada Mufaddal would be conducted outside the United States. Tyebjee attests that the parties initially attempted to resolve their dispute in California, with the assistance of Shehzada Qaid. (Tyebjee Decl. ¶ 4.) She further attests that Shehzada Qaid requested that the parties travel to London, where they eventually contacted Shehzada Mufaddal. (*Id.* ¶¶ 17-19.) Nomanbhoy refers to this information as "new evidence" that was impermissibly submitted in a reply brief, but he does not contradict Tyebjee's version of events in his surreply. (*See* Dkt. #32.) The tenuousness of the parties' connection to England is underscored by the fact that the arbitration was conducted in a different country, Sri Lanka, and

---

[11] Nomanbhoy attests that Shehzada Mufaddal is a citizen of India but that he travels extensively and maintains a residence in London. (S. Nomanbhoy Supp. Aff. ¶ 5.)

that other meetings with Shehzada Mufaddal occurred in Egypt, India, and Sri Lanka. (*See* S. Nomanbhoy Supp. Aff. ¶ 24.)[12]

Nomanbhoy also argues that the parties contemplated that part of the *hisab* would be performed abroad and that this satisfies the requirements of section 202. In support, he attests that when the parties drafted the Settlement Agreement they "expected that [the *hisab*] would be performed abroad, either in London or in another foreign location where Shehzada Mufaddal would be present to guide us." (S. Nomanbhoy Supp. Aff. ¶ 15.) Tyebjee, on the other hand, attests, "Contrary to Shabbir's assertions in his Supplemental Affidavit, the parties to the Dyna Care dispute did not expect Mr. Fallah to perform, much less complete, the *hisab* anywhere other than in the United States, where Mr. Fallah lives and where Dyna Care's records were kept." (Tyebjee Decl. ¶ 22.) Even if one assumes that Nomanbhoy's testimony is true, it does not establish that performance of the *hisab* had an important foreign element. Rather, as Nomanbhoy's testimony shows, the *hisab* would be performed "where Shehzada Mufaddal would be present to guide us." The portion of the *hisab* that was performed in London was done so at the request of Shehzada Mufaddal, who could easily have chosen another foreign location or a location in the United States. (*See* S. Nomanbhoy Supp. Aff. Ex. B (Shehzada Mufaddal's directive that the *hisab* meetings "will be held *in Cairo or London*" for nine days).) Under these unique factual circumstances, the court cannot conclude that the Award "arise[s] out of" a relationship that has some reasonable relation with England, where the Settlement Agreement was made, or Sri Lanka, where the Award was made. *See* 9 U.S.C. § 202. Nomanbhoy's petition must be dismissed for lack of jurisdiction.

---

[12] Respondents dispute that they met with Shehzada Mufaddal on other occasions to discuss the Dyna Care dispute. (*See* Tyebjee Decl. ¶ 26 ("The main reason for traveling to the different countries was for religious sermons that are held annually in different parts of the world.").) Even assuming that these meetings were part of the dispute resolution process, they do not establish a reasonable relation with a foreign state.

**CONCLUSION**

For the reasons stated above, respondents' motion to dismiss the petition for lack of subject matter jurisdiction [#22] is granted. Nomanbhoy's motion to confirm the Award [#16] is denied. This case is terminated.


Dated: December 21, 2011                    Enter: _____
                                                   JOAN HUMPHREY LEFKOW
                                                   United States District Judge